The next one is 23-63-16, U.S. v. Pasternak. Thank you. May it please the court, Daniel Habib, Federal Defenders of New York, on behalf of Thomas Pasternak. With the court's leave, I intend to focus on the instructional errors in this case. The district court here... Before you do that, can I ask you a quick housekeeping question? Your third challenge is a challenge to the calculation of the sentence. It appears that Mr. Pasternak has completed his carceral sentence. That's true. Is that challenge essentially moved now? No, Your Honor. Mr. Pasternak completed the prison component of his sentence in June, and he's now serving two-year concurrent terms of supervised release. But the sentence challenge doesn't in any way address his term of supervised release? It doesn't, but this court has held in, for example, United States v. Chestnut, which is 989 F. 3rd. 222 at 224-25, 2nd Circuit, 2021, that the completion of a prison term does not moot a challenge to the calculation of the sentence or to the length of the sentence of incarceration on the logic that the district court, if this court were to vacate the sentence and remand for resentencing, the district court could reduce the term of supervised release to compensate for what would have been, in essence, over-served time. And so as long as that possibility is not remote or speculative, the sentencing claim isn't moot. That said, in light of the practical significance of the conviction, I'll turn there. The district court in this case committed two errors in instructing the jury on the elements of wire fraud. First, the court defined property for purposes of Section 1343 to include, quote, intangible interests such as the right to control the use of one's assets, unquote, an instruction held invalid in the Supreme Court's subsequent decision in Simonelli. Second, and independently, the court refused Pasternak's request to charge that a scheme to defraud must contemplate inflicting on its victims not just informational injury, but, quote, tangible economic harm, a requirement imposed by a consistent line of this court's fraud precedents. So if I go and buy a, I'm looking to buy a handbag, and I bought a Gucci handbag, and you sell me a counterfeit Gucci handbag, have I been deprived of, and I pay for it, have I been deprived of information or money, or both? You've certainly been deprived. You certainly have been deprived of information in the sense that you've been lied to about the nature of what you bought. You've also been subjected to economic harm because a counterfeit bag is not worth what a Gucci bag is worth. And that fact could be adduced in a counterfeit case and is regularly adduced in counterfeiting cases by explaining that Gucci bags retail for this and counterfeit bags retail for a fraction of this. Isn't that what we have here? No, Your Honor. In this case, what we have is that Pasternak sold good cars that worked, whose buyers drove them without incident for years. There were two pieces of evidence in this case about the relative value of rebuilt cars and clean cars, and I do think it's worth emphasizing what they were. One, the government's expert testified that as a general matter, a rebuilt car would be worth about 25 to 30 percent less than a clean car. Two, Joel Friedman, who bought the Volt that was the subject of the Count 5 wire fraud charge, testified that the car he bought was about $2,000 or $3,000 less, and he paid $10,000 for his car, about $2,000 or $3,000 less than comparable cars he saw advertised at the same time. That aligns precisely with the government expert's estimate. And so on the facts of this case, the evidence is absolutely consistent with the proposition that Mr. Pasternak applied just the discount that the expert said would be appropriate. So it's an interesting theory, and I think it's a through line through a number of your arguments, that if the value of the cars that the purchasers received was commensurate with what they paid, then the only injury is informational injury, and therefore, we've got a problem. I'm trying to reconcile that with – Justice Breyer addressed sort of this issue in a case called Shaw v. United States, and he said the statute, while insisting on a scheme to defraud, demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss. He quotes Learned Hand as saying, a man is nonetheless cheated out of his property when he is induced to part with it by fraud, even if he gets a quid pro quo of equal value. Doesn't that statement kind of cut you off at the knees, because it is even if they got a quid pro quo of equal value, they have been deprived of their property to with their money when they paid for something that was different from what he said they were getting. So a few responses to Shaw, Your Honor. And first, I would encourage the court to take a look at, as I'm sure the court is aware, this issue is teed up before the Supreme Court in Coussis, which CERT was granted over the summer. And I would encourage the court to take a look at the petitioner's brief in Coussis, which addresses Shaw at some length and explains why Shaw does not compel the conclusion that mere fraudulent inducement, which I think is what Your Honor is describing, does not violate the Wire Fraud Statute. But let me summarize as best I can the argument. So Shaw is a case concerning the Bank Fraud Statute, not the Wire Fraud Statute, which has a different mens rea, number one. Number two, the discussion in Shaw is true dictum, because in Shaw, the bank was injured in its property interests. The court made clear that the bank, right, there can be intent to sustain a wire fraud prosecution under this court's precedence. There has to be some financial or property loss. And the property loss in Shaw was the bank was deprived of its use of depositor funds, and it was also deprived of its property rights as a bailee. So the discussion of whether there had to be, in addition to property loss, financial loss, was dictum in Shaw. And I suspect that's why Shaw was able to assemble a unanimous vote for this proposition when it is, in fact, the subject of a quite mature circuit split. As to Roe, even learned judges are wrong sometimes. And I think the Supreme Court has made clear in Simonelli that what Judge Hand is describing in Roe is no longer cognizable harm for purposes of the Fraud Statute. And what's the precedent that, I mean, granted it's old precedent, but it is Second Circuit precedent. What's the case that we as a panel can say overruled that so that we're not bound by it? So I'd say, one, I would urge the court to take a look at this court's decision in Regent from 1970, which explains why the statement in Roe can't be read for what it's worth. Indeed, in Roe itself, the statement was dictum because the buyer in that case did not get a quid pro quo of equal value. He got worthless land or the buyers got worthless land. And Regent makes clear that even when money changes hands in the course of a transaction that has been induced by deceit, that's not sufficient to prove the intent to defraud necessary under the Wire Fraud Statute unless there has also been a showing of contemplated economic harm. As to the underlying trial, what evidence do you have to support the argument that the jury relied on the right to control theory? So what we have, Your Honor, is really the way that the evidence came in and the way that the case was tried. In this case, as I've indicated to Judge Parker, there was not evidence, for the most part, that the cars were sold for more than they were worth. There was repeated testimony from the buyers. We had witnesses, buyers who testified to that effect, didn't you? With respect, Your Honor, the buyers testified to informational harm. They testified that they would not have bought the cars if they had known the truth. That is a classic, and that was a reasonable way to try this case under this Court's right to control precedence. The buyers did not say that they paid more than the cars were worth. In fact, the only buyer who testified about the price of his car vis-a-vis other cars in the market, Mr. Friedman, testified that this car was discounted relative to the going rate. And so, Judge Oliver, it was the testimony of the buyers that they had been subjected to informational harm. The repeated testimony, again, not improper under right to control precedence, but the repeated testimony that they would not have bought the cars had they known the truth. That sufficed under a right to control theory, but it no longer suffices in light of seminality, which makes clear that the wire fraud statute only protects traditional, tangible property interests. I wouldn't have purchased the counterfeit bags if I knew they were counterfeit. That's informational harm? No, Your Honor, because in your hypothetical there's an established value differential between the Gucci bag and the counterfeit bag. And again, I do want to emphasize the framework here. We're not here on a sufficiency posture. We're here arguing about whether the omission of the tangible economic harm element of wire fraud was harmless beyond a reasonable doubt. The standard applicable to that claim is in Nieder, which says that the omission of an offense element, and this is an offense element, the omission of an offense element can be harmless only if the evidence in support of it was overwhelming and the element was uncontested. But whether that's error or not depends entirely on where we stand on this sort of Shaw issue, right? If parting with your money to get a car that you wouldn't have bought is sufficient to show an economic harm, then there's no harm no foul. You can't imagine a scenario where they would have convicted on the informational harm theory but not the depriving them of their money and property theory because they are the same transaction that would support a conviction of both. On the other hand, if you're right that the depriving of your, the still alive theory, the post-Seminole theory requires the government to prove a value differential between what people got and what they paid for, then that's the realm you're arguing. Yes. Okay. And I would just say, and I'm mindful of my time, but what I would say is that there are, I understand that it sounds counterintuitive to say that getting money through a lie is not fraud. But if this court reads carefully a number of this circuit's precedents, including Regent, Starr, and Rosamondo, all of which are cited in our briefs, in all of those cases money changed hands as the result of a lie. The buyers of stationery in Regent were lied to about who the sellers were and where the stationery came from. The buyers of mailing services in Starr were lied to about how the defendants were using their money. And the benefit fund in Rosamondo was lied to about the retirees' income. And here the buyers were lied to by Pasternak when he denied that the vehicles he was selling had salvaged history and been in accidents. That's right. And we conceded that below. But in Regent, Starr, and Rosamondo, in all of those cases, notwithstanding the lie and notwithstanding the exchange of money as a result of the lie, the evidence was held insufficient to support wire fraud. And that's the same principle we're asking the court to apply here. Thank you. Thank you. Mr. Siegel. May it please the court, Jonathan Siegel for the United States. I also represented the United States at trial and sentencing. Your Honor, before I get into my specific arguments, I'd just like to level set on the law of the Second Circuit on fraud. The defendant made the argument that Roe is not good law and that you can look to this court's decision in Regent to see that. I printed out a copy of Regent, which is 421 F. Second, 1174. And I'm going to read from page 1181. Thus, taken in its factual context, the formulation of law stated in the Roe decision was perfectly accurate in affirming that a wrong has been suffered when a man is deprived of his chance to bargain with the facts before him, where the absent facts are facts material to the bargain he is induced thereby to enter. And the point that Regent is making there is that, yes. What year? I'm sorry? What year was Regent? Regent is 1970, and it's the seminal case on the intent to harm in the Second Circuit. And it's long before the right to control theory, so it has nothing to do with the right to control theory. The defendant is right that not every time someone is lied to as part of a transaction does that amount to fraud. That was the holding of Regent, and that was the holding of Starr. But what Regent makes clear, including in the place where I just read, is that where the lie goes to the essence of the bargain, then it is fraud. That is the essence of fraud. Here, the lie was that these cars had not been in accidents, that these cars had not been totaled, and that these cars had not been salvaged. And the government produced proof at trial from purchasers who testified that those misrepresentations were made to- Yes. Yes, repeatedly. Not only did Mr. Pasternak advertise the cars as clean on Craigslist, but all cars on their title by law have a salvaged brand on them or a rebuilt brand on them. Because it is so important by law, customers are required to be informed of that. Pasternak covered those brands with stickers. When customers even asked about it to confirm, he then lied to them to their face. It is hard to imagine something that is more essential to the bargain of the quality or adequacy of a car when buying a car. Has this car been totaled in an accident? I think if I'm understanding the argument of your counterpart, we might have this sort of intuitive sense that the car that comes from the rebuilt or the salvaged pathway is in some way less valuable, which is why that's information that people would want. But if at the end of the day that intuition is wrong, if at the end of the day what they got was commensurate with what they paid for, then the harm is an intangible harm of not realizing the thing that the sticker covered, not a tangible harm of getting something of lesser value than you paid for. Well, you're under the law in the Second Circuit, and again, this comes from regent and subsequent cases. It's not the difference between what you got and what you paid for. It's the difference between what you got and what you bargained for. In this case, yes, Mr. Pasternak was selling cars cheaply. People were traveling from all around the metropolitan area, including from Westchester all the way down to Sheepshead Bay, to purchase these cars because they thought this is a very good price for a clean car that's never been in an accident. That's a very different value proposition if, in fact, this is a car that had been totaled in an accident. So that changes the essence of what they bargained for. And it's easy to think of examples. If there's a restaurant that is a kosher restaurant and is purchasing meat, and it is seeking to purchase kosher beef and has instead sold pork, it's not an offense to say, this was great pork. This pork is actually worth more than the kosher beef. You should be happy that you got this pork. The fact is they bargained for the beef. They wanted the beef. And that's not informational harm. That's they have now wasted their money to buy something that they did not want. So that is the law in the Second Circuit. It's not enough to say, well, it's OK. You got a quid pro quo of equal value. In fact, that's been explicitly rejected in Roe and then reaffirmed in Regent as long as the lie goes to the essence of the bargain, which is exactly what happened here. But Your Honor, quite candidly, Your Honors, the court doesn't even need to address that because the entire Simonelli issue was waived. In this case, the government never sought to introduce the right to control theory. In the government's proposed jury instructions, there was no mention of the right to control theory. The first time it was introduced is when the defense requested an instruction on the right to control. Of course, at the time, that was an accurate description of Second Circuit law, the proposed instruction. There wasn't some gambit that made that more defense friendly. It actually gave a second theory for convicting them. Why isn't that just a case law that says it's not a waiver if you propose an instruction that's in conformity with the then existing law? Your Honor, there's actually no authority that is cited or that the government is aware of that an invited error of a jury instruction is waived if the law changes. And in fact, on plain error, the standard is quite clear that even if the law has changed, even if the precedent at the time was entirely against you, your obligation is to object, and if you don't object, you bear the consequences of that. The case that's cited by the defense in their reply is an Eleventh Circuit case. I believe it's Duel de Lau, and I apologize if I butcher that. Where that case was saying, though, is that it wasn't about alternate theories. It was the law described the case, the law described the crime a certain way at the time, and the Eleventh Circuit said there's no point in saying you have to request a jury instruction that's wrong in order to not waive. Here, the defense introduced this entire issue. There was no question that it was mandatory to instruct on the right to control. You didn't have to, and the government didn't seek to because the government never thought the right to control had anything to do with this case. But where you have a situation where it is only the defense that introduces it, and then the government ultimately doesn't rely on it and its arguments are all tied to money, to allow the defense to then raise that as error is inequitable and is not consistent with this court's precedence on invited error, where this court has consistently held those are not reviewable on appeal. But even if- Let's say you have a case where you have both loss of money and count one, loss of information, loss count two, and the government proves up both theories, and then we have a criminality situation where the second theory becomes eviscerated. How are we to handle that situation on appeal? How do we know which theory the jury convicted him of? So assuming it's reviewable at all and it's on a plain error standard, I believe it's the Second Circuit's decision in Capers, which is a Yates error, and it's the burden of the defense to show that there's a reasonable probability that the jury relied on that. And the ways you can look at that is by looking at the evidence, looking at the arguments of the parties, and looking at the entire picture. Here, there was never an argument by the government that all that these buyers were deprived of was information. In fact, every time the government talked about it was money because it was undisputed at trial. There was never a question that this was a sale where money changed hands. But if defendant's theory is right, that you only qualify from sort of what's remaining of the wire fraud, fraud posts in the Nellie, if there's a delta in the value of what you got and what you paid for. And let's put aside whether that's right or not. But if that is right, then you could well imagine there's probably not even sufficient evidence to convict on that theory. And the only theory that the jury could have convicted on is this informational, which is described as exactly what the theory was. It's got misdescriptions as to the nature of what they're buying. If they're right on what I'm going to call the Shaw issue, then doesn't that decide the case? Your Honor, there was evidence that salvage cars are worth less. The buyers did say that these prices were good, which is why they bought them. There wasn't evidence comparing the price that this car would have sold at that it wouldn't have, in part because of the nature of this case that these, and this gets sort of beyond a lot of the issues in the appeal, these cars weren't even properly rebuilt cars. This gets into the whole Indiana scheme where the defendant was rebuilding the cars, having them rebranded as rebuilt in Indiana without any kind of inspection. So yes, a regular rebuilt car that is properly rebuilt under regulatory standards is 20, 30% less. There isn't really a market that you can say how much they go for for these illegally rebuilt cars. I guess what I'm wondering is in my understanding of this, the answer to the Yates question turns on the answer to the Shaw question. If you are right on the Shaw question, there's no universe in which they could have convicted on the informational theory without also convicting on the straight up money property theory. If the defense is right on the Shaw theory, you could imagine, you could well imagine a universe where the jury convicted on the informational theory. They paid for something that was, they weren't told fully what they were paying for without the money property theory, which in defendant's view requires proof of value differential. That's I guess what I'm saying. Is that an inaccurate statement of the framework? So Your Honor, I guess just the issue that I'm having is to say that there needs to be not only proof that there was a lie about what you were bargaining for, but you actually need to do an analysis of what would be the market price for this thing you got versus what would be the market price that you paid, regardless of whether you or anyone else would have actually transacted at that. It would just be such an evulsive law and change in the law. Sure. So you're 100% take a different view on the Shaw issue. And I get that. So to answer your question, I think if this court were to add an additional element, contrary to the precedents, that there needs to be a delta not just in what was bargained for, then that would not be something that the jury was instructed on or that the government focused on proving or if there was evidence of because ultimately under the instructions and under the law it's irrelevant. I see. One thing I do want to address is- And you'll need your time's running out, so try to be-  The defendant repeatedly talks about how there's two independent errors in the jury instruction and tries to treat his reframing of the right to control as a separate argument. I would just refer to the court to page 636 of the appendix. And in there, the defendant makes clear in asking for what they call their second claim, it really is just part of the right to control. And what the defendant says there is clearly the right to control is a valid theory for mail fraud. And then I'm skipping ahead. But I think the case law requires if that instruction is given, that it is supplemented by indicating that before the jury may convict on that basis, the government must prove that the scheme, if successful, would have created a discrepancy between what the customers reasonably anticipated and what they actually received. So the idea that these are separate arguments is not worn out by the record. They were always really the same argument. Okay. Thank you, Your Honor. Thank you. Mr. Habib. Thank you. Judge Robinson, you have our argument. So let me address the merits of the Shaw issue with two authorities. First, I'm going to read from the same page of Regent that my friend Mr. Siegel did. And this is at 1181. Quote, neither the Roe case nor the language quoted will support the conclusion that no definable harm need be contemplated by the accused to find him guilty of mail fraud. Earlier on the same page. If there is no proof that the defendants expected to get, quote, something for nothing, or that they intended to get more for their merchandise than it was worth to the average customer, it is difficult to see any intent to injure or to defraud. I'd also refer this court to United States v. Starr, which is cited in our briefs, and this is at 816 F. Second at 101, addressing both Roe and Regent's gloss on Roe. In Roe itself, the victim suffered a definable harm because they were induced to pay large sums of money for worthless property. After Regent, therefore, there can be no doubt that Roe has been deprived of much of its vitality. And so those are the precedents of this court to which I would direct Your Honor's attention. Can't you infer from the fact that your client went to great lengths to hide from the purchasers that the provenance of these cars, that that information would have diminished the value of the cars as a consumer? No, Your Honor. I think it's an equally reasonable inference that the purpose of concealing the salvage history of the cars was to facilitate registration of the cars in circumvention of the New York Department of Motor Vehicle procedure for doing so, which I think the testimony was- But that goes to the value, right? If you have a car that you can't register, that's a component of its value, isn't it? The cars could be registered, Your Honor, and they were registered. In fact, they were registered by these buyers even after their salvage history came to light. The purpose of the concealment, or at least an alternative explanation for the concealment, was the circumvention of the bureaucratic process at the DMV. Before you sit down, let me again be sure I understand your theory as to why this error was not harmless beyond a reasonable doubt. Yes, so I would say a few things, Judge Parker. First, it is the, as Judge Robinson has commented, the paucity of evidence about the actual value of these cars versus the value of comparable clean cars. That's number one. Number two, it's as I was discussing with Judge Oliver, how the testimony of the buyers came in. They didn't say they have overpaid for the cars. They didn't say they had been cheated out of $2,000 or $3,000. To the contrary, they said they had gotten good value relative to the market for their cars. But what they said was that they had been deprived of information, and I'm paraphrasing, information that would have been material to them in deciding whether or not to buy the cars. That is informational harm, and that's taken off the table by Seminelli. And then finally, I grant that the prosecutor, the trial prosecutor, did not use the phrase right to control in the jury address. However, the prosecutor did assent to the right to control instruction, indeed drafted the actual instruction that was given. And in the course of summation, we've collected these. And trial counsel, defense counsel, liked that instruction? No, no, Your Honor, no. I want to be crystal clear about that. We proposed an instruction from this Court's decision in Bindé to the effect that tangible economic harm also needed to be shown. The instruction actually given, to which we absolutely objected, came from Finazzo. It was drafted by the government, or I guess drafted by this Court and presented by the government, which omitted the tangible economic harm requirement. The word harm does not appear in the jury charge. But the assertion is that your initial proposed instruction included a right to control theory piece that the government didn't ask for, and that that ties your hands now in terms of challenging that on appeal. So I would say a couple of things, Your Honor. First, I do want to maintain the distinction that I've drawn between these two errors, and I do think they are distinct claims. We agree that the Simonelli error, the right to control error, is reviewed for plain error. But I think if you look at the reasoning of the Eleventh Circuit's Duldulao decision, it's persuasive. Why do we have an invited error rule? It's to prevent sandbagging by the defense. It's to prevent the defense from manipulating the appeal by introducing error and then reaping the benefits of it. These concerns aren't implicated when the instruction is sought in reliance on well-settled precedent. I think Duldulao also makes the sound point that it's necessary to identify an exception to the invited error doctrine in this circumstance in order to give retroactive effect to a substantive decision of the Supreme Court narrowing the scope of a federal criminal statute. I suppose you're also saying even if you introduced the concept of a right to control instruction into the conversation, you didn't bless or invite the instruction that was actually given. Absolutely not. We 100% objected to it prior to the charge conference or during the charge conference and then prior to the submission of the case. Thank you, Your Honor. Thank you very much. Appreciate it.